*J. L. Worden*, for the appellants.

May Term, 1855.

COMEGYS v. THE STATE BANK.

| 6 | 357 |
| 125 | 506 |

---

COMEGYS and Others *v.* THE STATE BANK OF INDIANA and Others.

Sureties are not only entitled to contribution from each other for moneys paid in discharge of their joint liabilities for the principal, but they are also entitled, as a general rule, to the benefit of all securities which have been taken by any one of them to indemnify him against such liabilities.

Where one of several accommodation parties to a bill who have taken a mortgage from their principal by way of indemnity, discharges a prior mortgage upon the land, he is entitled, upon the foreclosure of the mortgage executed to him and his co-sureties, to be allowed for the amount actually paid by him to discharge the prior lien.

May Term,
1855.
──────
COMEGYS
v.
THE STATE
BANK.

Thursday,
June 7.

Where one of several accommodation parties to a bill has procured a mortgage from the principal to indemnify them, he is entitled upon the foreclosure thereof to be allowed a reasonable sum for his trouble and expense in procuring it; but nothing for attorneys' fees in defending suits against him as a party to the bill.

ERROR to the *Marion* Circuit Court.

PERKINS, J.—Bill in chancery to foreclose mortgages. Decree of foreclosure.

The bill was filed by the state bank and *Isaac Dunn* against *Cornelius G. W. Comegys*, *Enoch D. John*, *Noah Noble John*, and others. The record of the case is voluminous, and presents several questions. Brevity will be consulted by stating and deciding them separately. The controversy in the case is between *Isaac Dunn* and *Comegys*, the only solvent parties liable upon two bills of exchange, which are set out in the record, in these words:

" Exchange for $4,500. *Lawrenceburgh, December* 2, 1841. Four months after the date of this first of exchange, second unpaid, pay to the order of *Wymond* and *Ferris*, at the *Merchants' Bank of New-Orleans*, forty-five hundred dollars, value received, and charge the same to account. *Isaac Dunn.* To *N. N. John, New-Orleans.*"

This bill was accepted by *N. N. John*, and was indorsed by *Wymond* and *Ferris*, *E. D. John*, *A. P. Hubbs*, *John* and *Comegys*, a firm composed of *E. D. John* and *Cornelius G. W. Comegys*. The indorsement was to *Beverly Chew*, esq., cashier, or order.

" Exchange for $4,000. *Cincinnati, November* 23, 1841. Four months after date of this first of exchange of this tenor and date, second unpaid, pay to the order of *E. D. John*, at the *Citizens' Bank of New-Orleans*, four thousand dollars, for value received, and place to account of yours, &c., *John* and *Comegys*. To *N. N. John*, esq., *New-Orleans.*"

This bill was accepted by *N. N. John*, and indorsed by *E. D. John*, *Isaac Dunn* and *A. J. Wheeler*. The indorsement is to *J. B. Perrault*, cashier, or order.

A question is made as to the relation existing between the several parties upon these bills. This question is to be resolved by the evidence in the cause; and we think

it satisfactorily establishes that they were drawn for the benefit of *Noah Noble John*, and that all the others were accommodation parties.

As to the bill for 4,500 dollars, *B. F. Morris*, the president of the *Indianapolis* branch bank, says: "At the date of the bill, I was in *Cincinnati, Ohio*, and was applied to by *Enoch D. John*, one of the firm of *John* and *Comegys*, to purchase the above-described bill. He stated that the money was for the use of *Noah N. John*, who had purchased a quantity of flour of *John* and *Comegys*, to ship to *New-Orleans*. The bill, when first presented to me, was indorsed only by *Wymond* and *Ferris* and *Enoch D. John*. Having under my control, and in my possession, some funds belonging to the branch at *Indianapolis* of the state bank of *Indiana*, I agreed to negotiate the bill for and on account of said branch, if the indorsement of *A. P. Hubbs* and *John* and *Comegys* were added. *Enoch D. John* agreed to add their indorsements, and left *Cincinnati* to go to *Lawrenceburgh*, as he said, for the purpose of procuring the indorsements; and it was agreed between us that if *Noah N. John* brought the bill to me the next morning, with the additional indorsements, I would purchase it and pay him the money. The next morning *Noah N. John* called on me in *Cincinnati*, with the bill indorsed as I desired, and I paid him the money and received the bill."

As to the bill for 4,000 dollars, it is conceded by *Isaac Dunn*, one of the indorsers and a plaintiff in this bill, now seeking to exclude *Comegys* from the benefit of the mortgages in question, in a letter written by him to the *Franklin* bank of *Cincinnati*, the then holder of the bill, that *Comegys* was but an accommodation party; and *N. N. John*, in his deposition, says: "The bill for 4,000 dollars, in the bill in chancery mentioned, was drawn by *C. G. W. Comegys*, in the name of the firm, for my accommodation. The bill for 4,500 dollars was indorsed by *Enoch D. John*, in the name of the firm of *John* and *Comegys*, for my accommodation."

Other evidence confirms the truth of this statement. It is true, that *N. N. John* wished to use the proceeds of -

the bills in the purchase of flour from *John* and *Comegys*, millers, and that he was the son of *E. D. John*, one of said firm; but it appears that it was no object for *John* and *Comegys* to sell to him; that they had other offers for their flour at the same price that *N. N. John* was to pay; and that he had the preference simply on account of his relationship to one of the firm.

We are satisfied from the whole case that the proceeds of the bills went to *N. N. John*, and that, as between the parties to them, he was the real debtor, and should have paid them. This disposes of the first question.

Said *N. N. John* did not pay the bills. He sold the flour purchased with them in *New-Orleans*, where his father, *E. D. John*, then was, received the proceeds of the sale, and, instead of applying them, as was expected, in payment of said bills, he placed a part of them in the hands of his father, said *E. D. John*, who immediately left for *Texas*, taking the money with him. *N. N. John* expressly asserts that he left the money with his father, as his individual agent, and not in his character as a member of the firm of *John* and *Comegys*, and that *Comegys* received no benefit from the act. The remaining portion did not pay the bills.

Afterwards the complainant, *Isaac Dunn*, procured said *E. D. John*, then in *Texas*, to execute two mortgages to *Noah N. John*, whose money said *E. D. John* had fled with, dated *March* 11, 1842, upon certain parcels of land in *Hendricks* and *Marion* counties, *Indiana*, conditioned that said *Enoch* should cause to be paid to said *Noah N. John* the two bills of exchange herein before copied, or should exonerate said *Noah* and all others on the bills from liability, or that, on his failure to do so, the mortgaged premises should be sold for the benefit of all the parties concerned.

Said *Noah*, the real debtor, as we have seen, in those bills, having subsequently become a certified bankrupt, assigned said mortgages severally in the following words:

"I having been released from my liability for the payment of said bills of exchange which the within mortgage was given to secure (by the operation of the bankrupt ˉlaw,) I therefore hereby transfer all my right, title, interest,

and demand of and to the within mentioned premises, to *Isaac Dunn*, and the other indorsers, drawers, &c., therein named, and for the purpose therein expressed and contained, which is the application of the proceeds of said lands, as far as it will go, to the payment of said bills of exchange. Given," &c., " this 31st day of *July*, 1843. *N. N. John*, [SEAL.]    Attest: *W. C. Layton*."

These are the mortgages being foreclosed; and a question is made as to who has the beneficial interest in them.

The mortgages, assigned as above, were delivered to complainant *Dunn*, as he says, to secure him, in the first place, and, in the next place, to secure others concerned; but the assertion is in direct conflict with the terms of the mortgages and assignments, and with what is laid down by *Story* in the first volume of his Equity Jurisprudence, p. 555, as a general principle of equity, viz., that " sureties are not only entitled to contribution from each other for moneys paid in discharge of their joint liabilities for the principal; but they are also entitled to the benefit of all securities which have been taken by any one of them to indemnify himself against such liabilities."    The application of this principle may be, in some cases, controlled and limited by special circumstances, but in the case before us, the very provisions of the mortgages and assignments require its adoption in its broadest extent.

*Comegys* had a right to share equally with *Dunn* in the benefit of the mortgage securities.    So far upon the second question.

The lands embraced in the mortgages in question were covered by a previous mortgage to the state, which was payable in state bonds at par, though the bonds were purchasable in market at a great discount.    The mortgage to the state was paid off, as complainant *Dunn* claims, by him, and he seeks to be subrogated to the rights of the state and reimbursed the full amount.    He is entitled to be allowed the amount actually paid by him in cash for the bonds, with interest, and no more.

A question of fact is made as to certain of the bonds used in paying off the mortgage to the state, whether they

were purchased by *Dunn* or *Comegys* for that purpose. *Comegys* furnished the disputed bonds to *Dunn* to hand over to the state, *Comegys* says, as a payment on his part upon the mortgage, but *Dunn* says as a payment to him of notes he held on *Comegys*, whereby the bonds became his, and should go to his credit in the account as to the payment of the state's claim. These notes, it appears, were not given up, though the bonds amounted to more than the notes; nor was the overplus paid to *Comegys*. We see no facts in the case tending to prove that the bonds were given by *Comegys* to *Dunn* in payment of notes held by the latter.

We proceed to the fourth question.

Among the claims insisted on by *Dunn* as having priority of payment out of the mortgaged premises, is one for trouble and expense in procuring the mortgages from *E. D. John*, which, so far as was reasonable, would be properly allowed; and also one for a large amount for attorneys' fees in, we suppose, defending a suit against him as surety on one of the bills of exchange in question, though the specification is vague. We see nothing else for which the fees could have been paid. He would not be entitled to be allowed such fees.

Having now considered most of the questions raised, and stated facts sufficient to make them understood, we proceed to notice the institution and particular objects of, and decree in, this suit.

The two bills of exchange mentioned, were not, as we have stated, paid by *N. N. John*. The bill for 4,000 dollars was paid by *Comegys* and *Dunn* in equal proportions—2,000 dollars each. The bill for 4,500 dollars has not been paid, but is held by the *Indianapolis* branch of the state bank of *Indiana*, which, under an arrangement with *Dunn*, is, jointly with him, foreclosing the mortgages given by *E. D.* to *N. N. John*, and by the latter assigned to *Dunn* for the benefit of the parties to the bills of exchange; and the struggle is between *Dunn* and *Comegys*, as we have seen, in regard to the application of the proceeds of the sale of the mortgaged premises. The bank, it is manifest,

May Term,
1855.

should be first paid, as such payment will accrue to the benefit of both *Comegys* and *Dunn*, as indorsers of the bill held by the bank. But the overplus—is *Dunn* to be preferred in the distribution of that? It will appear, from what we have said, 'that he is not, except as to expenses paid, &c., in obtaining the mortgages for the benefit of both himself and *Comegys*, and the amount, if any, he may have paid beyond the amount paid by *Comegys* upon the mortgage to the state.

In rendering the decree in the cause the Court below has not given the *data* upon which it proceeded; but it has, apparently, allowed *Dunn* for counsel fees, and excluded *Comegys* from reimbursement for money paid for state bonds to be applied on the state's mortgage, and for the 2,000 dollars paid on the 4,000 dollar bill of exchange. This was wrong as to the fees and the money paid for the bonds, and wrong as to that paid on the bill of exchange, unless, as is contended, *Comegys* had previously been refunded that sum. We are far from being satisfied by the evidence that such is the fact; and as the cause must be reversed, at all events, we add no more on this latter point, but direct that the parties have leave to amend pleadings or adduce further evidence in the cause, if they, or either of them, desire to do so, touching the question of distribution, but not to disturb sales of real estate made.

*Per Curiam.*—The decree is reversed with costs. Cause remanded for further proceedings not inconsistent with this opinion.

*J. Morrison, S. Major* and *P. L. Spooner*, for the plaintiffs.

*O. H. Smith* and *S. Yandes*, for the defendants.